Opinion filed June 25, 2015



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00140-CR
_____

## CHRISTOPHER REDIC, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 161st District Court**
**Ector County, Texas**
**Trial Court Cause No. B-38,440**

## MEMORANDUM OPINION

The jury convicted Appellant, Christopher Redic, of murder following his plea of not guilty. Appellant pleaded "true" to an enhancement paragraph. The jury assessed punishment at confinement for thirty years, and the trial court sentenced Appellant accordingly. On appeal, Appellant asserts that the evidence was insufficient to convict him of murder and that the trial court erred when it (1) admitted lay opinion evidence under Rule 701 of the Texas Rules of Evidence,

(2) denied his motion for directed verdict, and (3) failed to include a reasonable doubt instruction in the jury charge during the punishment phase of the trial. We affirm.

## I. *The Charged Offense*

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of the individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011). The State provided notice of a felony enhancement paragraph. The punishment range for a murder conviction, as enhanced with a prior felony conviction, is confinement for life or confinement for not less than fifteen years or more than ninety-nine years and may include a fine not to exceed $10,000. *Id.* § 12.42(c)(1) (West Supp. 2014).

## II. *Evidence at Trial*

Freddie Hall (the victim) was shot and killed at the Odessa Motor Inn (the Inn). The State presented three eyewitnesses—Karlosia Tatum, Jamar Jarnel Gearard, and Monica Hall (the victim's wife)—all of whom testified that they saw Appellant, whose nickname was "Dutch," shoot the victim. The State also presented other witnesses who were at the scene, including Misty Walden and Scota Gaston,[1] who described events before and after the shooting. Alvanisha Johnson testified about events that took place at her apartment after the shooting. The State also presented the testimony of several law enforcement personnel, who testified about the investigation and the apprehension of Appellant, and a forensic pathologist, Dr. Ruth Kohlmeier, who testified about the autopsy she performed on the victim and the cause of death. Kevin Richard Callahan, a firearms examiner with the Texas Department of Public Safety, gave his opinion about whether spent shell casings and

---

[1]Scota Gaston was Appellant's girlfriend.

bullets had been fired from the pistol recovered at the location where Appellant was arrested. The defense asserted that one of two other men at the scene—Robert Henderson, whose nickname was "Chi Town," or Gearard—could have been the shooter.

## A. *Events Prior to the Shooting*

Walden testified she was at the Inn when the victim was shot and killed.[2] She was there with Eric Olivas, her boyfriend; Monica; and the victim. Before going to the Inn, Walden and Olivas had been at the victim and Monica's apartment to celebrate Olivas's birthday. There, they drank and used drugs. Later, they decided to go to a club but, instead, went to the Inn. The victim drove his Jeep to the Inn and parked in the parking lot. The victim got out of the Jeep, but Monica, Olivas, and Walden remained in the Jeep.

Walden saw Henderson at the Inn. Earlier that day, the victim was upset because Henderson had bullied Olivas; Henderson and the victim had argued. Walden thought Henderson and the victim would end up in a fight. In her testimony, Monica confirmed that the victim had argued with Henderson. Gearard testified that, a few days before the shooting, he gave Appellant some money to buy drugs from the victim. Gearard claimed the victim gave him "bad dope," and Appellant said he would kill the victim.

Tatum testified that, on the night of the shooting, she drove Gearard, Gaston, and Appellant to the Inn. Appellant and Gearard went upstairs, while Gaston and Tatum stayed in the car. Gearard testified he went to a hotel room with Appellant and met with Henderson. About an hour later, Gearard, Appellant, Henderson, and Angie Thatcher went downstairs. Appellant and the victim stood next to the victim's Jeep and talked.

---

[2]Walden thought of the victim as a brother because he always looked out for her.

Monica testified that the victim drove her, Walden, and Olivas to the Inn. Appellant, Henderson, and another man she only knew as "JR"[3] came out of Room 202 and walked downstairs. Walden recalled that the victim and the others stopped near the passenger side of the Jeep and that the victim was dancing after he shook hands with someone, but she could not see who it was. Tatum testified that her car was behind the Jeep and that the victim, Appellant, Henderson, and Gearard were in front of her car.

### B. The Shooting at the Inn

Gearard testified that the victim walked to the passenger side of his Jeep and began to dance and that Appellant then walked over to the victim and struck him on the head with a gun. Tatum also testified that she saw Appellant walk over to the Jeep and hit the victim on the head. Monica testified that the victim returned to his Jeep and continued to dance but that he appeared to be dazed. The victim then moved to the front of the Jeep and grabbed his chest. Monica saw Appellant with a gun in his hand and saw Appellant point the gun at the victim. Appellant fired shots. A bullet hit the ski rack on the Jeep, and debris went into the Jeep through the open sunroof. Tatum said that Appellant pointed a gun at the victim and that, as the victim ran around the Jeep, Appellant went after him. Tatum testified she saw the muzzle flash as Appellant fired two shots at the victim. Appellant was directly in front of her car. Gearard also saw Appellant fire two or three shots at the victim.[4]

Walden heard gunfire, but she ducked down in the Jeep and did not see who fired the shots. She was hit by debris when a bullet struck the Jeep. Walden saw

---

[3]JR's name is never identified in the record.

[4]Gearard testified that he did not see Henderson with a gun and did not see him use a gun to shoot at anyone.

Appellant run around the front of the Jeep and then saw the victim get up and run to the side of the building. Gaston also heard gunshots, and she ducked down in Tatum's car and did not see the shooting.

Monica moved the Jeep so she could find the victim after he ran to the side of the building; she found him lying on the ground, flat on his stomach. She got out of the Jeep and rolled him over. Monica called 911 and told the 911 operator that Appellant had shot the victim. As Monica spoke to the 911 operator, Walden started CPR on the victim, but he took only one breath and then stopped breathing.

*C. Events After the Shooting*

After the shooting, Henderson remained at the scene, but Appellant got in the backseat of Tatum's car and Tatum drove away. Gaston and Gearard were also in Tatum's car. Gearard saw Appellant with the pistol in his lap and said that Appellant reloaded the pistol. Tatum drove to the Southwest Oaks Apartments; there, Appellant threw his T-shirt on the roof of the apartments. Tatum left her car at the apartments, and the four of them walked to Alvanisha Johnson's apartment, which was in another apartment complex.

Johnson testified that Tatum, Gearard, Gaston, and Appellant came to her apartment on the night of the shooting and that they acted strangely. Johnson had not seen them in a month or two, and when they entered, Appellant prayed near the wall. Tatum also saw Appellant pray when he was in Johnson's apartment. Tatum claimed her car had broken down. Johnson did not want them there and asked them to leave.

Appellant, Tatum, Gearard, and Gaston left Johnson's apartment, got into a taxi, went to a motel, and stayed there overnight. Gearard testified that, while they were at the motel, Appellant cried and seemed remorseful for what he had done. The next morning, Gaston, Tatum, Gearard, and Appellant left with Gaston's mother. Gaston's mother took all four of them to another motel, where they had been living,

and they checked out of that motel. Later, Appellant, Gaston, and Gaston's mother went to Temple, Texas.

*D. Police Investigation, Arrest of Appellant, and Firearms Testing*

Robert Blackman, a sergeant with the Odessa Police Department, was a corporal on patrol the night of the shooting. He went to the scene and saw a Jeep in the parking lot and a male lying on the ground. The male had on a T-shirt. There was a hole in the mid-chest area of the T-shirt, and there was blood around the hole. Sergeant Blackman saw two females, one of whom was performing CPR; he also saw a male standing next to the females.

Crime scene technicians from the Odessa Police Department were dispatched to the crime scene. There, they took photographs and collected evidence. The evidence included a knife, paint chip fragments, a piece of the ski rack that had a bullet hole in it, and a baggie that contained a white powdery substance. Another officer with the Odessa Police Department recovered a T-shirt from the roof of the Southwest Oaks Apartments.

Michael Liverett, a homicide detective with the Odessa Police Department at the time of the shooting, investigated the victim's murder. He gathered information from officers who were at the scene; searched Henderson's room at the Inn; and interviewed Monica, Olivas, Walden, Henderson, Memory Harwick, Jamal Overstreet, Kayla Gaston, Thatcher, Gearard, and Tatum. He interviewed Henderson again at the police station.

Tatum admitted that, when she first spoke to police in Odessa, she denied seeing anyone shoot the victim and denied seeing Appellant with a gun in his hand. She said she was scared and did not think the victim had been shot because he got up from the ground and ran away. Tatum testified that she had asked Appellant, before the shooting, if he had drugs or a gun on him. Appellant said he did not.

6

Texas Rangers and United States Marshals assisted in locating Appellant in Temple, where he was arrested. Law enforcement officers also found Gaston at the location where Appellant was taken into custody. When officers searched a bag Gaston had with her, they found a pistol wrapped in men's underwear, and they also found ammunition. The pistol and the ammunition were given to Kevin Richard Callahan, a firearms examiner with the Texas Department of Public Safety, for testing.

Callahan examined the shell casings and bullets recovered from the crime scene and the body bag. He testified that the pistol found in Gaston's bag had fired the four cartridge cases and the three bullets given to him.

### E. Autopsy Evidence

Dr. Kohlmeier testified that she performed an autopsy on the victim. She located two bullet entry wounds and two corresponding exit wounds. The first bullet entered the victim's mid-chest area and exited the left side of the victim's back. The first bullet had gone through the heart and the left lung; crossed the diaphragm on the left side; and injured the stomach, spleen, left kidney, and left adrenal gland. This gunshot wound was fatal. The second bullet entered the victim's left thigh region and exited through the left buttock region and resulted in a soft tissue wound. Dr. Kohlmeier noted that the victim also had lacerations on the right forearm, left side of the forehead, left cheek, left side of the jaw, left shoulder, and the palm of his left hand; there also were bruises on his right thigh and lacerations on his right knee, right leg, and left knee. She also located a projectile in the body bag, and the projectile was introduced into eveidence.

### F. Appellant's Theory

Tommy Lee Johnson testified that he knew Appellant and the victim but did not see them argue on the day the victim was shot. Johnson said Appellant was not the type of person to shoot and kill someone. Appellant argued that Henderson could

have been the shooter because of an argument Henderson had had with the victim over money. Henderson sent a text to the victim that read, "Don[']t f--k wit[h] me n---a….[I] want my bread!!!!!!! It is what it is.....on f----n sight!!!!" Walden said, during a taped interview, that the victim had told Henderson not to bully Olivas and that Henderson had said in response that he was going to get his pistol. Rusty Martin, a corporal with the Odessa Police Department at the time of the shooting, spoke with Monica at the scene. Corporal Martin said Monica did not identify Appellant as the shooter when he made initial contact with her.

## III. *Discussion and Analysis*

We will first address Appellant's second and third issues in which he challenges the trial court's denial of his motion for directed verdict and the sufficiency of the evidence. We will then address his first issue, concerning the admission of Detective Liverett's testimony, and then the fourth issue, in which Appellant complains of jury charge error.

### A. *Issues Two and Three: Motion for Directed Verdict and Sufficiency of the Evidence*

A challenge to a trial court's ruling on a motion for directed verdict is, in actuality, a challenge to the sufficiency of the evidence to support the conviction. *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990). We review a challenge to the sufficiency of the evidence under the well-recognized standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). In that review, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App.

2010). The State adduced evidence from three witnesses—Tatum, Gearard, and Monica—that saw Appellant shoot the victim and from a fourth witness, Walden, who saw Appellant with a gun, saw Appellant chase the victim, heard gunshots, and then saw the victim on the ground after he had been shot.

Tatum and Gearard testified they saw Appellant hit the victim in the head. Gearard saw Appellant with the gun in his hand and saw him fire two or three shots at the victim. Tatum saw Appellant with the gun, saw the victim fall to the ground, and saw the muzzle flash from two shots. Monica also saw Appellant with a gun in his hand, which was pointed at the victim. She also heard shots fired and, after the shooting, called 911 and told the 911 operator that Dutch had shot the victim. Walden also testified she heard shots fired as Appellant ran around the front of the Jeep. Walden got out of the Jeep and performed CPR, but the victim died from a fatal gunshot wound to the chest.

After the shooting, Gearard saw Appellant with the pistol in his lap and saw Appellant reload the pistol. Gearard said that Appellant cried and felt bad because of what he had done.

Texas Rangers and United States Marshals recovered a pistol and ammunition from Gaston's bag. Callahan testified that the bullets and the spent cartridge cases recovered from the crime scene were fired from the pistol. After a review of the record, we hold the evidence was sufficient for a rational jury to have found beyond a reasonable doubt that Appellant was guilty of the murder of the victim. We overrule Appellant's second and third issues.

*B. Issue One: Lay Opinion Testimony*

Appellant asserts that the trial court abused its discretion when it admitted "lay-witness opinion over [his] TEX. R. EVID. 701 objection." The trial court overruled Appellant's hearsay objections in response to the State's questions about what Henderson had been doing at the Inn that evening before the shooting and about

9

what his role was in the shooting.  At trial, the following exchange occurred during the prosecutor's direct examination of Detective Liverett:

> Q. After your interview with the guy known as Chi Town, what did you -- and everything else you had available with you at that time, what was his role in the incident?
>
> A. The gentleman known as Chi Town?
>
> Q. Yes, sir.
>
> [DEFENSE COUNSEL]: Your Honor, we are going to object to this, if this is learned by the detective as a result of hearsay that he obtained from others, and not from his actual observations, obviously.
>
> [PROSECUTOR]: Your Honor, I think he is allowed to testify as to his investigation.  What he learned, what he developed, and how he pursued those avenues.  I am just asking him if after his interview with Mr. Henderson, if that caused him to feel that Mr. Henderson played a certain role, and if so, what that role was.
>
> THE COURT: I will allow that.  Overruled.
>
> A. To my knowledge, Mr. Henderson had been staying at the hotel.  From statements of his own, he had been moving narcotics out of the hotel and he had been contacting people in and out of his room throughout the evening.
>
> Q. And with regard to this incident -- after you interviewed him, what do you feel his role with regard to this incident was?
>
> A. A witness.
>
> Q. Merely a witness?
>
> A. Yes, sir.

Appellant's trial counsel did not object at trial that the testimony was improper under Rule 701 of the Texas Rules of Evidence or that the testimony constituted

improper bolstering by Detective Liverett. Appellant lodged a hearsay objection at trial but has not advanced a hearsay complaint on appeal. Where the complaint on appeal does not match the objection made at trial, the proffered complaint is waived. TEX. R. APP. P. 33.1; *see Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (stating that the complaint on appeal must comport with that made at trial); *see also Franco v. State*, 339 S.W.3d 793, 795 (Tex. App.—Amarillo 2011, no pet.) Appellant has not preserved these complaints and has waived them. We overrule Appellant's first issue.

### *C. Issue Four: Reasonable Doubt Instruction in Punishment Phase*

In his fourth issue, Appellant argues that the trial court erred when it failed to include a reasonable doubt instruction in the jury charge at the punishment phase of trial. Article 36.14 provides in part that the trial court shall include in the jury charge "the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007); *Huizar v. State*, 12 S.W.3d 479, 483 (Tex. Crim. App. 2000). The plain language of Article 37.07, section 3(a)(1) requires that evidence of extraneous crimes or bad acts "may not be considered in assessing punishment until the fact-finder is satisfied beyond a reasonable doubt that [the extraneous bad acts and offenses] are attributable to the defendant." *Huizar*, 12 S.W.3d at 481 (alteration in original) (quoting *Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999)) (internal quotation mark omitted); *see* CRIM. PROC. art. 37.07, § 3(a)(1) (West Supp. 2014). Statutory violations of Articles 36.14 and 37.07 are purely "charge error" under Article 36.19, and "*Almanza* sets forth the appropriate harm analysis for charge error under article 36.19." *Huizar*, 12 S.W.3d at 484–85; *see* CRIM. PROC. art. 36.19 (West 2006); *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985). When we review the jury charge for reversible error, we first decide whether error exists, and if error exists, then we determine whether the defendant was harmed. *Martinez v. State*, 313 S.W.3d 358, 365 (Tex. App.—Houston [1st Dist.] 2009, pet.

ref'd) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994)).

The State introduced evidence from a witness, Leroy Zaragoza, that Appellant had assaulted and robbed him two weeks prior to the victim's murder. The State argued, in closing, that this extraneous offense evidence demonstrated Appellant's propensity for violence. The instructions to the jury in the punishment phase of trial did not include a reasonable doubt instruction relative to the extraneous offense. However, defense counsel did not object to the omission of the instruction from the jury charge. The State has conceded that it was error to omit a jury instruction on reasonable doubt in the punishment phase of trial, as required under Article 37.07, section 3(a)(1) of the Texas Code of Criminal Procedure. Nevertheless, that concession is not conclusive on appeal. *Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002); *Isham v. State*, 258 S.W.3d 244, 248 (Tex. App.—Eastland 2008, pet. ref'd). We must conduct an independent examination of the merits of Appellant's claim. *Isham*, 258 S.W.3d at 248. Article 37.07, section 3(a)(1) provides in relevant part:

> [E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to . . . evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible.

The plain language of this provision "requires that such evidence may not be considered in assessing punishment until the fact-finder is satisfied beyond a reasonable doubt that [the extraneous bad acts and offenses] are attributable to the defendant." *Huizar*, 12 S.W.3d at 481 (alteration in original) (quoting *Fields*, 1 S.W.3d at 688) (internal quotation mark omitted).

Because the State offered evidence of the assault on Zaragoza, which was an extraneous offense that could only be considered as part of the punishment evidence

if the jury found beyond a reasonable doubt that Appellant had committed the offense, the trial court should have given the jury a reasonable doubt instruction. *See Huizar*, 12 S.W.3d at 484. The omission of the reasonable doubt instruction from the jury charge on punishment was error. *Id.* But because Appellant did not object to the omission of the instruction, we review the error under the egregious harm standard. *Id.* at 484–85.

Egregious harm occurs, and reversal is required, only when the defendant has suffered such fundamental harm that he has been deprived of a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. Jury charge error is egregiously harmful if "it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Martinez*, 313 S.W.3d at 367 (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)) (internal quotation marks omitted).

We consider, in our review, the jury charge, the state of the evidence, the contested issues in the case, the weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record as a whole. *Martinez*, 313 S.W.3d at 367 (citing *Ngo v. State*, 175 S.W.3d 738, 750 n.48 (Tex. Crim. App. 2005); *Almanza*, 686 S.W.2d at 171). The review is on a case-by-case basis, and the defendant must show actual harm, not just theoretical harm, which is a difficult standard to meet. *Almanza*, 686 S.W.2d at 174; *Martinez*, 313 S.W.3d at 367 (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). An additional part of our assessment includes whether evidence of the extraneous offense was clear, strong, direct, and unimpeached. *Martinez*, 313 S.W.3d at 367.

Appellant cross-examined Zaragoza about his inability to see his assailant on the night of the attack, but Appellant did not impeach Zaragoza's testimony about the attack itself. Zaragoza described the event and identified Appellant as the assailant. During closing argument, defense counsel mentioned that Appellant had not been charged with or convicted of that offense. Appellant argues that the

13

omission of the reasonable doubt instruction affected his defensive theory that he was not a violent person. However, there was overwhelming evidence that Appellant murdered the victim.

The State argued, in closing, that Appellant was a violent person and deserved to be imprisoned for life. Defense counsel argued for the lower end of the punishment range. The jury assessed punishment at confinement for thirty years, which is much closer to the minimum punishment. After a review of the entire record, we cannot say that the omission of the reasonable doubt instruction from the jury charge in the punishment phase, although erroneous, affected the very basis of Appellant's case, deprived him of a valuable right, or denied him a fair and impartial trial. *See Almanza*, 686 S.W.2d at 174; *Martinez*, 313 S.W.3d at 367–68. The error did not result in egregious harm to Appellant. We overrule Appellant's fourth issue.

## IV. *This Court's Ruling*

We affirm the judgment of the trial court.


MIKE WILLSON
JUSTICE

June 25, 2015

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

14